JULIAN LAUGHLIN, Appellant, v. HENRY D. LAUGHLIN.

In Banc, January 21, 1922.

1. **APPELLATE PRACTICE: Law** Action: **Substantial Evidence: Laches.** An action for a balance due on an open and running account extending through many years, tried by the court sitting as a jury, is an action at law, and if there is any substantial evidence to justify the findings, no instructions being asked or given, the judgment will be affirmed on appeal. And such is the rule where, although laches was pleaded in the answer, no affirmative equitable relief was prayed. And the same rule applies to the findings of the trial court on a counterclaim set up by defendant for money loaned to plaintiff.

2. ———: Equity: Accounting.  Where one count of plaintiff's petition is in equity for an accounting for shares of stock loaned to defendant, and for the proceeds of the sale of tracts of land to which defendant acquired title and held in trust for plaintiff, the court on appeal will consider the evidence *de novo*.  And if that relating to the sale of the stock is all oral, is conflicting and equally balanced, the court will not disturb the findings of the chancellor on that item; but if the evidence relating to the trust in the lands is not all oral, but is partly in the form of letters signed by defendant and other pertinent documents, the court will on appeal consider the whole evidence and make such findings as it authorizes.

3. IMPLIED TRUST: Parol Agreement: Statute of Frauds.  To prevent frauds courts of equity will charge a person as trustee who buys land at an execution or trustee's sale under a parol agreement with the owner of the equity of redemption to hold it in whole or in part for such owner under certain terms and conditions, and will enforce such an agreement as an implied trust for the owner.  The Statute of Frauds requiring express trusts in land to be in writing, has no application to such implied trusts.

4. ———: Acknowledgment: Repudiation: Limitations.  Where defendant's letter to plaintiff acknowledged that he held the title of certain lands under an implied trust that plaintiff was the actual owner, and expressed no intention to repudiate such fiduciary relation, the Statute of Limitations did not begin to run in his favor until plaintiff had knowledge that he had repudiated it.  Although not a technical express trust, because not in writing as required by the statute, but, having been created by parol agreement and convention of the parties in property of which plaintiff was already the equitable owner, it was not an involuntary trust, and under such circumstances the Statute of Limitations does not commence to run until the trust is repudiated to the knowledge of the *cestui que trust*, the rule being the same as in case of a technical express trust.

5. ———: ———: ———: ———: Removal from State.  Where defendant in a letter dated in 1898 acknowledged that he held title to certain Missouri lands under an implied trust that plaintiff was the equitable owner and expressed no intention to repudiate such fiduciary relation, and if he ever repudiated the trust with the knowledge of plaintiff it was after said letter was written, and two years later, or in 1900, defendant removed from Missouri and never returned to reside, the Statute of Limitations after that time ceased to run in his favor under any circumstances, and plaintiff's suit, brought in 1917, for the proceeds of the sale of the land, was not barred by limitations.

6. ———: Accounting: Laches. Where defendant was a trustee for plaintiff under an implied trust, and on numerous occasions during the long years which elapsed between the creation of the trusteeship and the bringing of his suit for an accounting, requested defendant verbally and in writing to settle; for years tried to induce him to arbitrate, which he delayed and postponed because of the press of other matters; they were brothers, and the defendant, although legally domiciled in Missouri until 1900, removed from the State in 1900 and was out of the State much of the time from 1888 until the suit was brought in 1917, no fault or laches can be attributed to plaintiff for not bringing his suit sooner.

7. ———: ———: Sale of Lands: Duty of Trustee. Where defendant held the title of lands under an implied trust that plaintiff was the actual owner, and sold them, he cannot excuse himself from paying the amount of money recited in the deeds as the consideration, by simply testifying that he did not sell the lands and did not receive anything for them; but having by letter informed plaintiff that the lands had been sold, that he had not yet received the purchase price, but expected to receive it, he must show what the lands sold for; if the consideration recited in the deeds he made was not truly stated, he must show what it really was, and if he did not receive it he must show why he did not, and that it was not through his fault.

Appeal from St. Louis Circuit Court.—*Hon. John W. McElhinney,* Judge.

AFFIRMED (*in part*); REVERSED AND REMANDED (*in part, with directions*).

*E. McD. Stevens* for appellant.

(1) The trial court erred in finding for respondent on the first count of the petition, by applying the Statute of Limitations to appellants' side of an account that ran to June 18, 1914, when suit was filed on October 22, 1917, because the acount began as far back as January 1, 1878, when it was shown to be a continuous account from 1878 to 1914, and was so treated by both parties in their correspondence and agreement to arbitrate up to the year 1917. Chadwick v. Chadwick, 115 Mo. 581; Ring v. Jamison,

66 Mo 424; Bank v. Thayer, 184 Mo. 61. (2) The court erred in finding for respondent on the second count of appellant's petition, as to the Monegaw Springs lands; when respondent admitted that all this 1650 acres of land belonged to appellant; that respondent had no interest in it; that the title was put in his name for some forgotten reason; that he conveyed these lands to others by warranty deeds; and that he paid not one dollar of the proceeds to appellant; whereby a resulting tract was established, and appellant's evidence showed clearly that appellant discovered respondent's frauds only three days before this suit was filed, and the doctrine of laches does not apply. R. S. 1909, sec. 2869; McMurray v. McMurray, 180 Mo. 526; Sauter v. Leveridge, 103 Mo. 615; Orr v. Wilmarth, 95 Mo. 212; State ex rel. Shipman v. Allen, 132 Mo. App. 98, 113; Silvig v. Hendrickson, 193 Mo. 265. (3) The court erred in finding for respondent on the second count of appellant's petition, as to appellant's half interest in Sac River farm; in the face of appellant's overwhelming testimony as to his possession and sole ownership in the entire tract; as corroborated by other witnesses, and also by respondent's admission that he heard of Sac River farm solely through his brother, the appellant, and knew something of appellant's services to the former owner, Funkhouser; also with respondent's admitted intention and promise to allow appellant "something" for putting him onto a good thing, wherein appellant had already reduced the mortgages from $11,000 to $2,500, and respondent put nothing into it, other than assuming payment of the $2,500 deed of trust; when the running account showed that respondent caused appellant to pay the taxes, $350; cost of building the barn, $925; insurance, $100, and a draft of $500 for cattle put on the farm by respondent. None of which sums were ever returned to appellant. (4) The court erred in finding for respondent on the second count of appellant's petition as to the $2,000 of Straight Creek Coal Co. stock, under appellant's testimony and respondent's ad-

missions in his correspondence with appellant. (5) The court erred in not finding that respondent was a trustee *ex maleficio* as to the Monegaw Springs and Sac River farm properties. (6) The court erred in finding for respondent on his unsupported testimony as against his written contracts, letters, drafts, notes, requests for money, and the testimony of eight opposing witnesses. (7) The court erred in excluding the answer of T. C. Laughlin to the 4th and 5th interrogatories in his deposition and in excluding the answers of Jesse B. Payne to his 8th and 9th interrogatories. Because parol evidence is admissible to establish the facts as to a resulting trust, as such trusts are not within the Statute of Frauds and are expressly excepted. R. S. 1909, sec. 2869; Plumb v. Cooper, 121 Mo. 668; Cardit v. Maxwell, 142 Mo. 266; Leahey v. Witte, 123 Mo. 207; Cason v. Cason, 28 Mo. 47; Richardson v. Champion, 143 Mo. 538; Damschroeter v. Thias, 51 Mo. 100; Shaw v. Shaw, 86 Mo. 594. (8) The court erred in holding that the Statute of Limitations would run in favor of a defendant, who, being a resident of Missouri previously to 1889, absents himself from the State from about 1888 until some indefinite time after 1900 on a transaction that occurred before 1900. R. S. 1909, sec. 1897; Orr v. Wilmarth, 95 Mo. 212; McMurray v. McMurray, 180 Mo. 526; Sauter v. Leveridge, 103 Mo. 615. Independent of Section 1897, the common law suspends the statute during absence from the State. Cobb v. Houston, 117 Mo. App. 645. And appellant and respondent, having entered into an arbitration agreement in 1898, in which all technicalities were waived, prevents the statute from running, independent of respondent's absence from the State. Bridges v. Stephens, 132 Mo. 524. (9) The trial court erred in not finding that respondent was a trustee as to the 1650 acres of Monegaw Springs land, and as to appellant's half interest in Sac River farm, and in the $2,000 of Straight Creek Coal Co. stock. (10) The court erred in finding for respondent on respondent's third counter-

claim, as the finding was against the law and the evidence of this case.

*Abbott, Fauntleroy, Cullen & Edwards* for respondent.

(1)  Plaintiff's action is not an action brought to recover a balance due on a mutual open and current account where there have been reciprocal demands between the parties.  The account sued on has none of the characteristics or features of a running account.  R. S. 1909, sec. 1893; Chapman v. Hogg, 135 Mo. App. 654; Leoffel v. Hoss, 11 Mo. App. 133; Sidway v. Lumber Co., 187 Mo. 649; 17 R. C. L. secs. 91, 92, pp. 730, 731; 2 Wood on Limitations (4 Ed.) secs. 277, 280, p. 426.  (2)  The provision of our statute with reference to the absence of the debtor from the State applies only if he is a resident when the cause of action accrues.  Mathews v. Appleberry, 57 Mo. App. 615; Fike v. Clark, 55 Mo. 105; Mastin v. Tilleston, 33 Mo. App. 622; Thomas v. Black, 22 Mo. 330; Scroggs v. Daughtery, 53 Mo. 497; Orr v. Wilmarth, 95 Mo. 212, 8 S. W. 258; Smith v. Bogliolo, 5 Mo. 344.  (3)  The fact that the debtor is outside of the State does not prevent the running of the statute, where the residence of the debtor remains within the State, so that service can be had on him which will authorize a personal judgment.  Bensley v. Haeberle, 20 Mo. App. 648; Venuci v. Cademartori, 59 Mo. 352.  (4)  Where a party goes to another State with the intention of returning, leaving in Missouri his family and property, the Statute of Limitations is not suspended as to him during his absence.  Garth v. Robards, 20 Mo. 523, 64 Am. Dec. 203.  (5)  When a running account is balanced and adjusted by one of the parties thereto, with the knowledge of the other, it becomes an account stated, and its items become subject to the Statute of Limitations, though the balance is not paid, but is transferred to a succeeding account, the balance in such case being treated as an

item of a new running account. Estes v. Hamilton-Brown Shoe Co., 54 Mo. App. 543; Agan v. File, 84 Hun, 607, 32 N. Y. Supp. 1066; Baird v. Crank, 98 Cal. 293. (6) Where cause is submitted to the court without a jury, and no declarations of law are asked and none given and no findings of fact, the only possible question on appeal is whether there is any substantial evidence to support the judgment rendered. Moore v. Carlisle, 209 S. W. 309. (7) When a prima-facie case is not made by plaintiff, and no instructions are asked or given, this court will not review evidence to determine its sufficiency to sustain plaintiff's case. Davis v. Dawson, 273 Mo. 512. (8) Where an action tried to the court was not presented on an agreed statement of facts, and reasonable minds differ as to the evidence, the application of the law to the facts cannot be reviewed, unless propositions of law in the form of declarations disclosing the theory on which the case was tried were duly requested. Life Assur. Soc. v. Natl. Bank of Commerce, 197 S. W. 117; Sicferer v. St. Louis, 141 Mo. 592; Sutter v. Raeder, 149 Mo. 307; Sell v. Bretelle, 162 Mo. 382; Jordan v. Davis, 172 Mo. 599, 608.

SMALL, C.—The petition, filed in 1917, is in two counts. The first count is at law for a balance of $20,404, due on open and running account, extending from January, 1878, to June, 1914. The second is a count in equity, for an accounting for 20 shares of stock of the face value of $2,000 in a coal company, which stock plaintiff loaned to defendant in 1883; also for the proceeds from the sale of two tracts of land in St. Clair County, Missouri, which defendant acquired title to in 1883 and held in trust for plaintiff.

The defense to both counts was a general denial, the five and ten-year Statutes of Limitations, and laches. The answer also contained several counterclaims for money loaned plaintiff by defendant after 1898.

The reply traversed the answer and counterclaims.

The evidence on the first count of the petition is very voluminous.  We have examined it carefully.  It was conflicting and its probative force rested upon the verbal testimony of the plaintiff and defendant.  There was no instrument in writing by which a case was made out for plaintiff by documentary evidence.  Nor were defendant's admissions sufficient to make out plaintiff's case.

As to the count in equity:  The evidence shows that the plaintiff and defendant were lawyers and brothers, the defendant being the elder.  He went to St. Louis and commenced the practice of his profession in 1869.  He was married, with a family.  Plaintiff, then single, went to St. Louis in 1877, and the brothers occupied the same office for many years.  The plaintiff soon acquired a profitable business.  As early as 1878, he commenced to loan defendant various sums for household and other expenses, on account of which defendant made payments from time to time.  Defendant kept no accounts, but left that matter to plaintiff.  Their relations were intimate and friendly for many years.  In fact, until about 1898, when plaintiff began to insist on a settlement.  In the eighties plaintiff did a large amount of work for one Funkhauser, who had large property interests, but had made a bad failure.  For his fee, by verbal contract with said Funkhauser, plaintiff was to receive the land in St. Clair County in question here.  It consisted of two tracts, one the Sac River Farm of about 1,000 acres, and the other the Monegaw Springs Property of about 1,600 acres.  There were two deeds of trust on the property, aggregating about $11,000, subject to which plaintiff was to take the property.  Funkhauser did not make a deed to plaintiff, but stood ready to do so on demand.  In some manner not clearly shown, plaintiff got the deeds of trust reduced to $2,500 in 1883.  He then approached defendant and told him that if he would pay off the $2,500 incumbrance on the property, plaintiff would give him half the proceeds from the sale of the Sac River Farm.

Thereupon, both visited the property, which was then in possession of Mr. McIlheny, a relative of Funkhauser. McIlheny, who seemed to know about the plaintiff's deal with Funkhauser, in the presence of defendant, recognized plaintiff as the owner and, in effect, turned over possession to plaintiff, or both plaintiff and defendant. Plaintiff and defendant spent several days hunting upon and examining the property. Up to this point, there is hardly a substantial dispute. At least, we have no difficulty in determining such to be the facts thus far. Plaintiff further testifies that defendant was satisfied with the property and agreed to his proposition, and then and there agreed to pay off the deed of trust and take over the property and control and manage the property until a satisfactory sale could be made, in the meantime, paying the taxes, but no rent. When it should be sold, plaintiff was to have one-half of the proceeds from the sale of the Sac River Farm and defendant one-half, and plaintiff was to have the whole of the proceeds from the sale of the Monegaw Springs Property. Plaintiff says, further, that when they returned to St. Louis, defendant, for purposes of his own, suggested that the title to both pieces should be conveyed to him and he would hold them for both parties, as agreed aforesaid. That some hitch arose as to Mrs. Funkhauser signing the deed, and, thereupon, it was agreed between plaintiff and defendant, that to secure title which defendtan was to hold, as before agreed, instead of paying off the $2,500 incumbrance and a judgment for taxes and taking deed from Funkhauser, they would let the deed of trust be foreclosed and defendant would buy in the property at the trustee's sale. This was done in 1883, and the defendant paid the trustee $2,500 and costs, the full amount of the incumbrance. He received a trustee's deed for all the property covered by the deed of trust, which included the whole of the Sac River Farm and part of the Monegaw Springs Property. The judgment for taxes was against about 600 acres of the

Monegaw Springs Property, and to get title to this, it was agreed that it should go to sheriff's sale. This took place about the same time in 1883. Plaintiff bid in the property for $25, paid the bid himself, but by agreement with defendant the sheriff's deed was made to the defendant. Plaintiff also says that afterwards, from time to time, especially about 1890 and thereafter, he vainly sought an accounting from defendant, which defendant always put off with a promise to account in the future and make a good showing, but he never did. About 1888, defendant went into other business in Chicago and was consequently away from St. Louis a large part, if not the most, of the time thereafter. But his legal domicile remained in St. Louis, until 1900, when Chicago was his permanent home and so remained up to the time the suit was brought.

Defendant's testimony is that he never agreed, but always refused, to pay off the $2,500 mortgage. But after visiting the property in 1883, as detailed by plaintiff, he agreed to buy it in at the trustee's sale for the amount of the debt and costs for himself, and if he ever made anything out of it, to give plaintiff something for putting him on to the bargain. That accordingly, such trustee's sale was had and defendant bid in the property, paid the purchase price, $2,500 and costs, to the trustee, who made him a deed, and defendant was ever thereafter the exclusive owner of the Sac River Farm. But he claimed no interest in the Monegaw Springs Property, which he considered of no value, but permitted plaintiff to have the sheriff's deed, under sale for taxes, to that property made to defendant for the plaintiff. Defendant further testified that he never received a cent from the Monegaw Springs Property, and if he ever made any deeds therefor they were brought to him by the plaintiff. That plaintiff, himself, transacted the business and received the consideration, if any, for all such deeds. That more than ten years before the suit was filed, plaintiff abandoned Monegaw Springs and said there was nothing there. Defend-

ant admitted getting a statement of account from plaintiff made out in 1891, afterwards dated February 9, 1892, when he had a conference with plaintiff relating thereto. That account had the following charges against defendant at the close thereof:

```
"Interest in the Sac River Farm
"20 shares Straight Creed Stock......$ 200.00
Trip to W. Va., not counted..........   60.00
Cash advanced by J. L. on farm........  350.00
Wood sold
Collected by J. L. from Carter & Co. ..   78.00
Insurance...........................   1500.00
Cash advanced by H. D. L...............        "
```

At the time defendant introduced this statement in evidence, lines were drawn through the above items. Defendant testified, he had it in his possession ever since 1891 or 1892, but that it was in the same condition as when handed to him by plaintiff. That the date is in the handwriting of plaintiff's wife. That the lines drawn through the items were drawn through by plaintiff in defendant's presence. In 1892, when plaintiff mentioned the Sac River Farm in discussing this statement, defendant said: " 'Julian, you know that that was a disastrous investment; I not only did not make money, but I lost money.' He said, 'Yes, I guess you did.' Then he said I sold wood. I said to him at that time, 'You know that I never sold a stick of wood from that place.' . . . We went through these items. . . . The next item is the taxes, which he claimed to have advanced for the Sac River Farm. I said, 'Julian, don't you think that, in view of the fact that when Ed Rannels transferred his claim against you for $3,500, you knew he meant to borrow it. Don't you think the tail should go with the hide?' He said, 'Yes, I think that is fair.' So, he drew his pen through that. The next item was the insurance, $1,500. I don't remember just what we said about that; but I know I said, 'You are not interested in that insurance.' And he drew his pen through that.

The next item was cash advanced by H. D. L. 'Well,' I said, 'I can't tell what advancements I have made. I have kept no books. I have depended upon you to keep the books and to tell me what money I had advanced you.' So we threw that out. He handed me the paper in that shape. I took it to Chicago and turned it over to the cashier of the American Brake Beam Company, and those figures at the foot here are in her handwriting.''

Defendant admitted writing a letter to plaintiff dated February 5, 1898, in which he referred to said statement and items therein, as follows:

''This statement ignores my check of Sept. 17, '89, for $60, the J. B. Johnson note for $350 of Aug. 10, '85, and all such moneys as you may have received from the warehouse, not included in your statement.

''*It also ignores the St. Clair County lands, which I believe will show a profit to you, if those at Monegaw are ultimately paid for, but none unless they are.* It also ignores the collection made by you from Carter & Co., and the trip to W. Va., 'not counted.' All of which are referred to and then erased at the end of your statement.

''In addition to all this, I have signed and herewith return to you the stipulation sent me for an arbitration before Robt. L. McLaran. I notice that it provides that he shall make his award 'not later than the first of March, 1898.' This I assume you do not mean. I ask no unreasonable delay, but my business compels me to be in New York in all probability the rest of this month, and although you have prodded me in a way that I never would have you, I cannot believe you insist upon my dropping everything else, and without delay enter upon a trial of this unfortunate controversy, regardless of results to me. If in this I am mistaken, I shall expect you to advise me.''

Nothing came of this agreement to arbitrate. It was delayed and put off largely at the request of the defendant, as were similar efforts of plaintiff to arbitrate made for several years before.

Defendant admitted he sold the Sac River Farm in 1890 to Edward Rannels and received $5,000 therefor. He admitted that he testified that he had never sold a stick of timber off of the Sac River Farm. He denied that he sold a large quantity of timber to a man named Boots. Did not remember that he filed a suit against J. T. Boots, returnable to the September Term, 1883, claiming damage for trespass on said land. Did not remember of attaching Boots's saw-mill boat, nor of Boots giving a forthcoming bond, not that he obtained judgment for $1,000 in that case, and that on the 17th day of June, 1889, he acknowledged payment thereof through his attorney in open court. Did not know of two other suits for $1,000 each against Boots for timber taken off of the land. Never received any money from Boots for lumber or timber. Those matters were all attended to by his attorney. "I remember the final outcome, after we got through with the whole transaction. I was in debt $185, and John Lucas wrote to me for the money, and I sent it."

By agreement, plaintiff read transcript of judgment in favor of defendant against Boots for timber taken off the Sac River Farm, as follows: "March 29, 1885, $1,000, satisfied June 17, 1889, by defendant's attorney."

Plaintiff also introduced in evidence official copies of four deeds made by defendant; one in 1883 to James W. Kollenberg, consideration $700; one in 1884 to Henry Fitch, consideration $300; one in 1886 to James Abnot, consideration $1,700 (in another place in the record, this consideration is stated to be $700); one dated July 29, 1895, to Morgan W. Cleveland, consideration $1,300. These deeds conveyed lands which were part of the Monegaw Springs Property. The evidence as to sales in Laughlin's Addition to Monegaw Springs was too indefinite to be of any probative value. Plaintiff denied that he had ever received any money from any sales of property in Monegaw Springs, or had anything to do with making any such sales.

Plaintiff also denied that Rannels ever had any claim against him, or that Rannels ever transferred any claim against him to defendant.

Plaintiff's witness, E. W. Rannels, testified: That he invested $3,500 in the Montezuma Irrigation Ditch, and in 1889 bought 840 acres of the Sac River Farm from defendant for which he turned over to him his interest in the Montezuma Ditch and gave his note for $5,000; which he paid. That he had no claim against plaintiff for $3,500 so invested. "I went into it with my eyes open."

In one of defendant's counterclaims, he sued on $3,500, as a claim against plaintiff assigned to him by said Rannels.

No instructions were asked or given.

After taking the case under advisement, the court found for the defendant on both the law and equity counts in the petition and against the defendant on all his counterclaims except the 3rd, on which it found and rendered judgment for the defendant and against the plaintiff in the sum of $264.

After unsuccessfully moving for a new trial, plaintiff appealed to this court.

I.     The issues raised by the first count and the answer thereto were triable at law.   While laches was pleaded in the answer, no affirmative equitable relief was prayed for.   Therefore, the first count was a law

Appellate Practice.

suit, not a suit in equity, and we cannot review the facts *de novo*.   But, if there is any substantial evidence to justify the finding of the lower court, no instructions having been asked or given, we must affirm its action.   [Koehler v. Rowland, 275 Mo. 573.]

II.     We have examined the evidence carefully and cannot see how we can interfere with the finding of the circuit court as to the first count.   It was for that court,

**Trial Findings.** sitting as a jury, to pass upon the weight, accuracy and sufficiency of the testimony of the plaintiff to sustain his cause, and the court found against him, and acted within its province in so doing. We must rule against plaintiff's appeal on the first count.

For the same reason, we cannot disturb the judgment against plaintiff on the 3rd counterclaim of defendant.

III.    The second count of the petition: This being a count in equity, we must consider the evidence *de novo*.

(a).    As to the Straight Creek Coal Company stock **Equity.** the evidence was all oral and was so conflicting that we cannot disturb the finding of the lower court concerning that item.

(b). As to the Sac River Farm and Monegaw Springs Property: We have set out the salient features of the testimony relating to this property in our statement of facts. The transactions took place years before the suit was tried, and, we think, the evidence **Oral and Documentary Evidence.** of the parties given at the trial shows that the defendant's memory, not unnaturally on that account, was somewhat at fault as to some important details. Therefore, particular regard should be paid to any statement in writing made by the parties. It is admitted by the defendant that, in 1891 or 1892, he received from plaintiff Exhibit "6," dated February 9, 1892, at the end of which were the following items or claims made by the plaintiff against the defendant:

"Interest in Sac River Farm
Cash advanced by J. L. on farm........$ 350.00
Wood sold
Collected by J. L. from Carter & Co..... 78.00
Insurance........................... 1500.00
Cash advanced by H. D. L. ...........    "

Defendant testifies that lines were drawn through these items by the plaintiff, under the circumstances and

for the reason given by him in his testimony, which we have set out fully in our statement of the case.  Plaintiff

**Implied Trust.**

denies that he drew any lines through these items, and says that the lines were drawn through them by the defendant, or, at least, without plaintiff's knowledge, after he delivered the statement to defendant.  But, after having the statement some six or seven years in his possession, the defendant in his letter of February 5, 1898, to the plaintiff, used the following language with reference to said statement:

"This statement ignores my check of Sept. 17, '89, for $60; the J. B. Johnson note for $350 of Aug. 10, '85, and all such moneys as you may have received from the warehouse, not included in your statement.

"It also ignores the St. Clair County lands, which I believe will show a profit to you, if those at Monegaw are ultimately paid for, but none unless they are.  It also ignores the collection made by you from Carter & Co., and the trip to W. Va., 'not counted.'  All of which are referred to and then erased at the end of your statement."

This language, without reference to when or by whom the lines were drawn through the items mentioned, contains no denial of plaintiff's claim for an interest in the Sac River Farm, but clearly indicates and acknowledges that plaintiff is interested therein as part of the St. Clair County lands, because the Sac River Farm alone is mentioned in the statement to which the letter refers, and also acknowledges plaintiff's interest in the Monegaw Springs Property, as another part of said lands. Also, defendant says, that he believes the St. Clair County lands will show a profit to plaintiff if those at Monegaw Springs are ultimately paid for, but none unless they are.  Defendant could not have thus written in 1898, if plaintiff never had any interest in the Sac River Farm, and had handled Monegaw Springs himself, and defendant had had nothing to do with it and knew nothing about it except to sign deeds when presented by plaintiff, as testified to by plaintiff at the trial.  We think defendant's lan-

guage in this letter is corroboration in writing by the defendant of the truth of plaintiff's testimony that he was interested in the Sac River Farm, as well as Monegaw Springs, and had no knowledge of the details as to how either property had been disposed of or handled by defendant. The language of this letter also impliedly acknowledges an existing trusteeship or obligation to account on defendant's part to plaintiff with reference to said St. Clair County lands, which included both the Sac River Farm and Monegaw Springs Property. The trust or obligation concerning both tracts arose out of one and the same agreement and transaction. There is no hint in the letter, that defendant does not intend to fully discharge his obligation to plaintiff with reference to said lands, whatever it may be. Indeed, defendant testi-

Limitations.    fied at the trial, that, in discussing the statement of February, 1892, in that year, plaintiff claimed an interest in the Sac River Farm, but defendant told him that it was a disastrous failure, and he made nothing, but lost money on it, which, defendant says, plaintiff said he knew and acquiesced in such statement. This conversation is denied by the plaintiff, but if it took place, defendant's failure to deny that plaintiff originally had an interest in said farm, on that occasion, was, in effect, an admission that he had some claim or interest thereto, and for which defendant should account but for the fact of its being a disastrous failure. The evidence shows it was not a failure, but that defendant sold it for $5,000, when he had only paid $2,500 therefor.

We hold that the truth of this controversy as to the manner that both pieces of the property, the Sac River Farm and Monegaw Springs (which defendant admits he held for plaintiff), were acquired and held by defendant, is with the plaintiff. We have no reasonable doubt of it.

Under such circumstances, that defendant was trustee for plaintiff there can be no question. The Statute of Frauds requiring express trusts in land to be in writing

has no application.  It is well settled, that to prevent fraud courts of equity will charge a person as trustee who buys in the property of another at execution or trustee's sale under a parol agreement with the owner of the equity or redemption to hold it in whole or in part for such owner under certain terms and conditions, and will enforce such agreement as an implied trust for the owner.  [Richardson v. Champion, 143 Mo. 538; Leahey v. Witte, 123 Mo. 207, and cases cited.]

Consequently, we hold that defendant was trustee for plaintiff as to one-half the proceeds of sale of the Sac River Farm and all the proceeds of sale of the Monegaw Springs Property.  Defendant's letter of February 5, 1898, shows that defendant had never before that time repudiated, but then still recognized, the fiduciary relation under which he held the property.  Said letter expresses no intention to repudiate such relationship.  Although the trust was not a technical express trust, because not in writing, as required by our statute, it was not an involuntary trust, but was created by consent and convention of the parties in property of which plaintiff was already the equitable owner.  Under such circumstances, the Statute of Limitations does not commence to run until the trust is repudiated to the knowledge of the *cestui que trust,* the same as in the case of a technical express trust.  [25 Cyc. 1159, and cases cited; Hunnicutt v. Oren, 84 Kan. 460; Hanson v. Hanson, 78 Neb. 589-93.]

We hold, therefore, that if there was ever any repudiation of defendant's trust with knowledge to the plaintiff, it was not until after defendant's letter of February 5, 1898.

It is admitted that in 1900, two years after the date of said letter of February 5, 1898, the defendant removed permanently from the State and never returned to Missouri to reside.  After that time, the Statute of Limitations ceased to run under any circumstances.  [Sec. 1897, R. S. 1909; McMurray v. McMurray, 180 Mo. 526; Orr v. Wilmarth, 95 Mo. 212.]

Plaintiff's second count is, therefore, not barred by the Statute of Limitations.

Nor can we allow the defense of laches. The defend- ant was a trustee for the plaintiff, and on numerous oc- casions, during the long years which elapsed between the creation of his trusteeship and the bringing of this suit, the plaintiff requested verbally and in writing that defendant make him an accounting, and for years tried to get defendant to arbitrate, which defendant delayed and postponed, not necessarily wilfully, but be- cause perhaps he was busy with other matters or out of a habit of procrastination, which largely possesses some lawyers—as well as others—and is of a truth "the thief of time." Besides, the evidence shows, that while defend- ant was legally domiciled in this State until 1900, when he removed permanently from the State, he was much, if not most of the time, out of the State personally from about the year 1888 until this suit was filed. So, the close relationship and friendship which existed so long between these brothers would naturally stay the hand of either to unsheath the sword of the law against the other. We can attribute no fault nor laches to the plaintiff for not bring- ing his suit before he did.

Consequently, we hold that defendant is responsible to the plaintiff for one-half of the proceeds of sale he re- ceived from the Sac River Farm, with interest at the rate of six per cent per annum since he received such pro- ceeds; also, for one-half of the insurance money he re- ceived from the loss of a building on said farm by fire (less amount he spent for building barn), with like in- terest, since he received it. It is admitted that defendant sold the Sac River Farm to Rannels in 1890 and received $5,000 therefor; that defendant received $1,500 insur- ance about 1890 from the destruction of a building on the farm by fire. But defendant paid out about half of that sum in building a barn. So, defendant should be charged with $750 balance due on insurance received. It is also shown in evidence that defendant sold quite an amount of timber off of the Sac River Farm to one Boots, but there

seems to have been much litigation in collecting for it, and defendant testified that the result of it all was a loss of $185. There is no evidence to the contrary. Nothing should be allowed for this.

The account as to the Sac River Farm against the defendant and in favor of the plaintiff, with interest, may, therefore, be stated as follows:

| | | |
|---|---|---:|
| 1890, | To one-half of $5,000 received from Rannels from sale of land.........$ | 2,500.00 |
| | To one-half of $9,000, being interest on the above amount from 1890 to date, at the rate of six per cent per annum.......................... | 4,500.00 |
| 1890, | To one-half of $750 balance of amount due for insurance received. | 375.00 |
| | To one-half of $1,350, being interest on above balance for insurance from 1890 to date at the rate of six per cent per annum.......... | 675.00 |
| | Total.............$ | 8.050.00 |

As to Monegaw Springs: The transcripts of deeds introduced in evidence by plaintiff show that defendant conveyed land which was part of the Monegaw Springs property by four different deeds, reciting an aggregate consideration of $4,000 in one place in the record, and $3,000 in another—that last deed being dated July 29, 1895. It is true, defendant denies receiving anything for these lands in his testimony and denies making any sales thereof himself, but in his letter of February 5, 1898, above quoted, defendant informs plaintiff of lands sold in Monegaw Springs from which he had not yet received the money, but which he expected to receive. Being the trustee of these lands for plaintiff, it is the duty of the defendant to account for the proceeds of the sale thereof. It is not sufficient accounting for him to say that he got nothing and knows nothing about such sales. He must show what these lands sold for, if the consideration was not truly stated in the deeds which he made thereto, and if he did not receive the considera-

tion or purchase price thereof, he must show why he did not receive it and that it was through no fault of his. This he has wholly failed to do. We are satisfied the plaintiff never received any such proceeds. Under such circumstances, we hold, that defendant, as such trustee, is liable to the plaintiff for the aggregate consideration (the least) mentioned in said deeds, $3,000, with interest from 1895, the date of the last deed, at six per cent per annum, until this date. Such interest, amounting to $4,500, added to the principal sum, makes $7,500, in all due from defendant to plaintiff on account of Monegaw Springs. The total liability of defendant to plaintiff on account of both Sac River Farm and Monegaw Springs, is $15,550 with interest thereon at the rate of six per cent per annum from January 1, 1921, until paid.

We, therefore, reverse the decree of the circuit court on the second count in the petition, and remand the case to said court, with directions to set aside its judgment on said second count heretofore rendered, and enter up judgment thereon in favor of plaintiff and against the defendant, for the sum of $15,550, with interest thereon at the rate of six per cent per annum from the first day of January, 1921, until paid.

The judgment heretofore rendered in the circuit court against the plaintiff on the first count of the petition and the third counterclaim of the answer, is affirmed.

We further order, that each party pay one-half of the total costs in the case in the Circuit as well as in the Supreme Court. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. *Woodson, Higbee, David E. Blair* and *Walker, JJ.,* concur; *James T. Blair, C. J.,* and *Graves, J.,* dissent; *Elder, J.,* not sitting.