John H. SWON, Ethel M. Anderson, Ella Englehart, Kathryn Adcock and Wallace E. Bell, Respondents,

v.

John HUDDLESTON and Claude Huddleston, Appellants.

No. 44649.

Supreme Court of Missouri.

Division No. 2.

Sept. 12, 1955.

Ralph L. Alexander, Warren D. Welliver, Columbia, Frank B. Edwards, Mexico, Alexander, Harris & Welliver, Columbia, Fry, Edwards & Wright, Mexico, of counsel, for appellants.

D. M. Cuthbertson, Fulton, for respondents.

EAGER, Judge.

This is a suit in equity denominated "Petition to Have Deed Declared a Mort- gage," but the prayer was for a decree declaring also that title to 360 acres of land was vested in the plaintiffs, for possession, and for general relief. The trial court found generally for plaintiffs on all issues, and entered a decree divesting defendants of title. Appeal has been duly taken. The action directly involves the title to real estate and jurisdiction is properly here; it was filed in the Circuit Court of Callaway County, where the land is located, but was transferred to Audrain County and tried there.

The record is long and the facts complicated. We shall only be able to recite those facts which are definitely material. John Swon died in 1905, leaving four children surviving him and leaving also considerable property, both real and personal. These children were John E., Allie Mae, Georgia Belle and Ella (who later married Marvin Wallace, and is referred to herein as Ella Wallace.) By his will John Swon disposed of sundry real and personal property; we are concerned here only with the interest of the son, John E. Swon, therein. By this will the land here in question and other property was devised to a trustee for John E. Swon; upon his death his widow, Ida Swon, if living, was to have a life estate in a specified tract of approximately 165 acres, and the other portions were to be conveyed by the trustee in fee simple to "the children of John E. Swon" (as was likewise directed with reference to the "life estate" tract on the death or re-marriage of Ida Swon). The original trustee declined to act; Don P. Bartley was appointed and continued to act until 1934, when he resigned and was succeeded by Wilmer C. Huddleston, a brother of Ida Swon. Huddleston acted as trustee for approximately five years. The defendants here are the surviving sons of Huddleston. John E. Swon (the devisee-son) died on October 9, 1938, leaving surviving him his widow, Ida, a son, John H. Swon, and four children of a deceased daughter (Ethel Bell). The son and four grandchildren of John E. Swon are the plaintiffs in this case. The widow, Ida Swon, died in June, 1950.

Following the death of John E. Swon, Wilmer C. Huddleston, as Trustee, filed in the Circuit Court of Callaway County, his petition for authority to make final settlement of the trust estate, with his accounts attached, setting out sundry facts, and listing the property remaining (all consisting of real estate), and he prayed an order approving his final settlement and ordering distribution. An order was entered on July 18, 1939, reciting that the deed of the trustee had been examined and it was ordered that the deed be recorded and delivered and that the trustee W. C. Huddleston and his sureties "be, and they are finally discharged herein." No such deed was in evidence, nor was its absence accounted for.

Somewhat out of chronological order, we must pick up the following facts: on January 2, 1930, a judgment had been entered for $1,903.30 in favor of The Peoples Bank of Auxvasse against John H. Swon and his wife in the Circuit Court of Callaway County. Execution was issued and levied on the interest of John H. Swon in this land, and that interest sold at public sale on February 17, 1930, to J. R. Baker on a bid of $500; it was deeded to him on March 31, 1930. At this time John E. Swon, the father, was still alive. By mesne conveyances this interest of Baker later vested in J. C. Smith (two-thirds) and Frank Baker (one-third). Since these latter persons also acquired the same interest by a subsequent levy and sale, we do not think it necessary to consider the validity of the 1930 levy and sale. After the death of John E. Swon (October 5, 1938), J. C. Smith procured judgment against John H. Swon in the same court in the amount of $2,853.97 on March 1, 1939; again, execution was issued and levied on the interest of John H. Swon in the lands in question, and a sale had on June 17, 1939; on a bid of $50, this interest was conveyed by the sheriff to J. C. Smith and Frank P. Baker. Although counsel for respondent refer to this latter sale as "unconscionable," there was never a direct attack upon it, and at the trial counsel conceded that John H. Swon had, in fact, lost his title by reason of these execution sales.

At the September 1939 term of the Circuit Court of Callaway County J. C. Smith and Frank P. Baker (holders of the execution titles) instituted a suit in two counts: (1) to try and determine title to the land in question, and (2) to partition it; named as defendants were the present plaintiffs, Ida Swon, W. C. Huddleston, Trustee, and Nellie Tompkins, the holder of a note and deed of trust executed by the previous trustee. The proceedings in that case are not completely shown, but the petition, one answer and the decree appear in full; no appeal was taken, and there is no attack here on the jurisdiction of that court. We may also note that the appellants here are claiming title solely under the sale in that proceeding. The record recites that a guardian ad litem was there appointed for the minor defendants. In the decree the court found that John H. Swon had been completely divested of all interest in the land, that Ida Swon was entitled to a life estate in a specified tract thereof, and that the owners in common were: J. C. Smith, one-third; Frank P. Baker, one-sixth; and the four grandchildren of John E. and Ida Swon (plaintiffs herein) one-eighth each. The court ordered: that title be quieted accordingly; that John H. Swon was "forever barred"; that a partition sale of the land be had, subject to the life estate of Ida Swon; and that the note and deed of trust (in the amount of $1,237) be paid out of the proceeds of sale. At this time there were back taxes of approximately $1,100 against the land. A public sale in partition was had on December 3, 1939, and all the land was then struck off to W. C. (Wilmer C.) Huddleston on a bid of $2,675. There was direct evidence by one witness that one tract of 160 acres was offered first and the bid was $2,650; that all the land was then offered and it brought $2,675. Two days after the sale Huddleston and Ida Swon executed their note and deed of trust to Nellie Tompkins for $2,000, presumably as a method of raising most of the purchase price. Three of the grandchildren testified that so far as they knew they received none of the proceeds of this sale. The sale was approved by the court and deed executed

and delivered. Out of that sale and the surrounding circumstances arises the present controversy. Huddleston immediately entered into possession of all the land except that of the life tenant, and farmed it, receiving whatever rents and profits there were for a period of ten years until his death on January 20, 1950; since his death the defendants have continued in possession, and since the death of Ida Swon (June, 1950) they have presumably occupied and farmed all the land.

The plaintiffs contend that Huddleston, by previous arrangement and agreement, bought the land for them at this sale, to hold it for them, use it, and convey it to them when he had reimbursed himself for his outlay and expenses. The trial court admitted (over objection) evidence of conversations at the home of Ida Swon on the day before the partition sale, in which Ida Swon supposedly said that she had talked to Huddleston (her brother), that she was not "bothered" a bit about the sale, that "Wilmer was taking care of it," and was "bidding it in for her and the children," and that when he got his money out of the land, he would deed it to her. Huddleston was not present at these conversations and we think the testimony was pure hearsay. We shall disregard it in our consideration.

It was shown, however, by competent evidence that Ella Wallace (a daughter of the original devisee, also the aunt of John H. Swon and great-aunt of the other plaintiffs) upon learning of the prospective sale went to see her "own trustee" and arranged to raise from her own trust funds the necessary money to bid; that she was "prepared to bid" for Ida and the children when she went to the sale,—to protect the heirs if "Wilmer failed to do so," and to see that her father's land did not go out of the family; that she did not bid because she thought Huddleston was buying it for the children. John Lewis of Kansas City was a friend of the family and he and his wife had raised Wallace E. Bell (one of the plaintiffs) from the age of three. Lewis came to Callaway County, conferred with Ella Wallace and Ida Swon prior to the

sale and attended the sale to bid the land in "for the protection of the children" if Huddleston did not get it; Lewis testified that he had five thousand dollars in a savings account, which he would have used if necessary. Immediately prior to the sale Ida Swon, W. B. Whitlow, her attorney, Wilmer Huddleston, J. C. Smith and Frank Baker conferred in an upstairs room of the temporary courthouse. When they came down, Ella Wallace and John Lewis met them and Lewis asked Huddleston if he intended to bid in the land for the protection of the heirs; he answered "that he was," and that he and Mrs. Swon had "come to that agreement"; or, expressed in other language, Lewis said, "I understand that you are going to bid this in for Ida and the heirs," and that Huddleston said, "Yes, I am." This evidence was asserted very positively by Ella Wallace, who was 83 years of age at the time of trial, and by John Lewis. Lewis also testified (without objection) that it was his understanding that Huddleston bought the land for Mrs. Swon and the children. Both also testified, with slight variation in wording, that immediately after the sale Huddleston asked Mr. Whitlow (who concededly was Ida Swon's attorney and the guardian ad litem in the partition proceedings) how the deed should be made out and that Mr. Whitlow said it would be "less complicated" and "make less bookkeeping" if the deed were made "to the trustee" (Huddleston) and when Wilmer got his money he could deed it to them. It was also in evidence that the sheriff first stated that Mr. Whitlow had said to make the deed to Ida and the children, but that Mr. Whitlow then replied as above. Frank Baker, an attorney of Fulton, testified that he bid at the partition sale, that he did not recall any conversation between Huddleston and Mr. Lewis or Ella Wallace on that day, but that it was "15 years ago and it's pretty hard to remember"; referring to the specific statement about buying the land in for the heirs he said, "I didn't hear that," but he also said, "I wasn't interested in that angle of it," and that he would not say the testimony was untrue. Each of the defendants testified

(over objections that he was a party to the suit and incompetent to testify to the transaction,—which was considered by the court as an objection under the "Dead Man's Statute"—Section 491.010 RSMo 1949, V.A. M.S.), that he did not hear his father say at any time, either at the sale or later, that he bought the land for the benefit of Ida Swon and the children; also, that each of them thought the farm "would go to us."

There was considerable evidence of conversations with Wilmer Huddleston during the years following the sale, as corroboratory of his claimed agreement. Ella Wallace testified: that she talked with him in the bank at Auxvasse in 1946 and asked him if he did not think it was time he was making the deeds to the heirs, as they were both getting old; that he replied, "Yes, I know it is, and we have been figuring on it, but Ella you know there was considerable expense attached to that * * * but if anything should happen to me my boys know what to do." Dwight Englehart (husband of one plaintiff) testified: that in late 1947 he heard Huddleston tell John H. Swon that as soon as he got his money out he intended to deed the land "to him and the children"; also, that somewhat later he heard Ida Swon ask Huddleston when he was going to deed the land back and the latter replied that they would go and attend to it when the weather was good and she felt well enough, but that "the boys" knew what to do. Robert Hunt testified: that he asked Huddleston about buying a small tract on the highway and that the latter said he "would rather I would see Aunt Ida, that he was merely holding the land for the heirs." Joe Swon Buckner verified this conversation. At another time John H. Swon told Huddleston that he would prefer that the latter should not plow up eighty acres of blue grass, to which Huddleston acceded without objection.

There was evidence of conversations between plaintiff John H. Swon and the defendants after Wilmer Huddleston's death as tending to show, directly or by implication, a recognition on their part of an obligation to deed the land back to the Swon heirs, and the making of demand. These conversations were vague and inconclusive and, since we do not rely upon them, we shall not relate them further. In 1945 and 1946 three small tracts were sold from this land, one of 4 acres, one of 6, and one of 40; the total consideration so received (presumably by Huddleston) was $2,750. Ida Swon joined in one of these deeds; with reference to another of these transactions, Ella Wallace testified: that she talked with the purchaser and that the sale was made "to help pay the thing out,"—the $2,675 that Wilmer had against the land; also, that all the tracts were sold with the "agreement of everybody." At about the time one of these tracts was sold Huddleston paid off the note and deed of trust which he and Ida Swon had executed two days after the partition sale. At the time of the partition sale the grandchildren (plaintiffs) of Ida Swon were respectively 22, 20, 18 and 17 years of age. They all lived in Kansas City and had relied (and continued thereafter to rely) entirely on Ida Swon for the handling of their interests in Callaway County. It seems that they had interests in other lands than those directly involved here, and they occasionally received payments from Ella Wallace, who handled other parts of the family land and money; the latter testified that she made payments to Wilmer Huddleston as "trustee" for these children as late as 1946, although he had been officially discharged in the John E. Swon trust in 1939. The record indicated that the Swon family held Huddleston in considerable esteem and had complete confidence in him (he being, as stated, a brother of Ida Swon.) Ida Swon became rather badly disabled about 1948. It was not shown that either Wilmer Huddleston or his sons had ever made any substantial permanent improvements on this land at any time.

There was much difference of opinion among the witnesses concerning the value of this land at the time of the sale to Huddleston. Witnesses for plaintiffs generally placed the value per acre at $45 to $75; defendants' witnesses at $12 to $17. The price paid by Huddleston was $7.43 per

acre, for the deed of trust was paid from the proceeds of sale; the back taxes constituted an encumbrance of about $3.00 per acre. Plaintiffs first went to a lawyer concerning their claim about January, 1951; that lawyer apparently did nothing for a year and then told them he could do nothing; about January, 1952, they employed their present counsel and this suit was filed on February 20, 1952.

Appellants first argue that their motion to dismiss the petition should have been sustained for the reason that it fails to state a claim. Counsel say that it attempts to allege four different theories and fails to state properly all the elements of any one. The petition is very lengthy and perhaps somewhat inartistic, but we have concluded that it states facts sufficient to constitute a claim. It recites the provisions of the will of John Swon, the creation and details of the trust for John E. Swon, one of the execution sales of John H. Swon's interest, the partition proceedings, an understanding and agreement between plaintiffs and Huddleston that the land was being sold to satisfy the debts, but was to be preserved for the heirs; that others were ready and able to bid and purchase the land; that Huddleston, while still acting as trustee for the heirs and knowing all the facts, and to induce a chilling of the bidding, falsely and fraudulently represented to all that he was buying the land for the plaintiffs as beneficiaries of the trust and that he would deed it to them when he had gotten his money out of the rents and profits from the lands; that the interested parties trusted Huddleston absolutely and that he knew that none of them would bid against him under these circumstances. The petition further alleged: gross inadequacy of price; that the others interested did refrain from bidding in reliance upon these representations; the subsequent possession by Huddleston, that he received all rents and profits until his death and that he had thus been fully reimbursed, with interest; also, his continued subsequent promises to reconvey and that there was no repudiation until after his death.

If the facts alleged in equity justify the court in declaring a trust on any theory, the petition must be considered sufficient. Collins v. Shive, Mo., 261 S.W.2d 58. And see also: Decker v. Fittge, Mo., 276 S.W.2d 144, 149. The ambiguity of the present petition and of the trial theory, together with the fact that no findings of fact or conclusions of law were requested or made, have caused this court to assume a considerable burden, but we hold the petition sufficient.

As indicated by appellants, we must consider four possible theories here, as follows: (1) a contract to convey; (2) an express trust; (3) a resulting trust; and, (4) a constructive trust. We shall deal very briefly with the first three as applied to the facts of this case. As an express contract to convey real estate, such an agreement as is here claimed would, very obviously, be unenforceable under the Statute of Frauds, Section 432.010 RSMo 1949, V.A.M.S.; Davis v. Holloway, 317 Mo. 246, 295 S.W. 105, unless the circumstances were such as to raise a constructive trust; and in the latter event the action would be one to declare a trust from the circumstances of the transaction and not to enforce the oral agreement as such. It may also be doubted whether there was any consideration here to support such oral agreement, for certainly no consideration passed to Huddleston in the usual sense. We need not decide that more specifically.

The agreement is not enforceable as an express trust. By the terms of Section 456.010 RSMo 1949, V.A.M.S. all express declarations of trust are required to be in writing. And see: Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981; Norton v. Norton, Mo., 43 S.W.2d 1024; Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447; Purvis v. Hardin, 343 Mo. 652, 122 S.W.2d 936; State ex rel. Cruzen v. Ellison, 278 Mo. 199, 211 S.W. 880.

Resulting trusts have been variously defined, but one of the most recent definitions appears in the case of Decker v.

Fittge, Mo., 276 S.W.2d 144, 147, where this court said: "However, it has been well stated 'that a resulting trust is founded upon "the natural presumption, in the absence of rebutting circumstances, that he who supplies the purchase money intends the purchase to be for his own benefit, and not for another, and that the conveyance in the name of another is a matter of convenience and arrangement between the parties for collateral purposes." ' " Such trusts arise by implication from the facts and circumstances rather than from express agreement; resulting trusts are sometimes confused with constructive trusts, but there are substantive distinctions. The cases seem universally to require that, in order to create the usual resulting trust, (there being certain special types—Vol. 3, Scott on Trusts, § 404.1—with which we are not concerned here), the beneficiary or cestui must have furnished the consideration and there must be a presumed intent on the part of the legal owner to hold for such beneficiary. Purvis v. Hardin, 343 Mo. 652, 122 S.W.2d 936; Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981. In the Purvis case, supra [343 Mo. 652, 122 S.W.2d 938], this court said that the test in considering whether a resulting trust arose is the "true ownership of the consideration". The evidence here does not justify a finding that plaintiffs or Ida Swon furnished the consideration for the purchase of this land at the partition sale. On the day of the sale Huddleston gave his check to the sheriff for $2,677.50. It is true that on December 6, 1939, two days later, Huddleston, his wife, and Ida Swon all executed a note for $2,000 and a deed of trust; the proceeds of this note presumably went to furnish to that extent the consideration for the purchase. There is nothing to indicate, however, that Ida Swon or the plaintiffs paid this note, and presumably Ida Swon either loaned her credit or was required to join because she was the owner of a life estate in a part of the land. We hold that no resulting trust arose, but this holding becomes more or less academic in view of our following determination.

■■ We have determined that upon the evidence here a constructive trust arose in and of an undivided one-half interest in the land in question for the benefit of the plaintiffs other than John H. Swon. We are fully aware of the rule so vigorously argued by appellants that such a finding from parol evidence requires that the evidence be so clear, cogent and convincing as to exclude all doubt from the mind of the court. Decker v. Fittge, Mo., 276 S.W.2d 144; Trieseler v. Helmbacher, 350 Mo. 807, 168 S.W.2d 1030; Collins v. Shive, Mo., 261 S.W.2d 58. There are many, and somewhat confusing, definitions of a constructive trust, and some confusion as to the constituent elements. Many cases say that such a trust must be based on fraud, actual or constructive. Beach v. Beach, Mo., 207 S.W.2d 481; Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981; Lucas v. Central Missouri Trust Co., 350 Mo. 593, 166 S.W.2d 1053; Gates Hotel Co. v. C R H Davis Real Estate Co., 331 Mo. 94, 52 S.W.2d 1011. Some apparently proceed upon the theory of unjust enrichment or of an unfair or wrongful holding, without any proof of fraudulent intent. Wier v. Kansas City, 356 Mo. 882, 204 S.W.2d 268; Lucas v. Central Missouri Trust Co., 350 Mo. 593, 166 S.W.2d 1053, loc. cit. 1057; Vol. 3, Scott on Trusts, § 462, pp. 2314–2316; in one very recent case, Decker v. Fittge, Mo., 276 S.W.2d 144, this court declared a constructive trust in the following language: "He held the title represented by the $2,477.97 payment as a constructive trustee for plaintiff. This, as has been stated, is not necessarily because of an imputation of fraud, but because to permit him to retain the property thus procured would tend to induce fraud and would be against public policy upon the true owner doing equity. Van Raalte v. Epstein, 202 Mo. 173, 192, 99 S.W. 1077, 1081."

■ If a fiduciary or confidential relationship exists between the alleged trustee and the beneficiary, no proof of fraud is necessary in order to establish a constructive trust. Trieseler v. Helmbacher, 350 Mo. 807, 168 S.W.2d 1030; Vol. 3, Scott

on Trusts, § 462, p. 2314; Vol. 3, Bogert on Trusts, §§ 495, 498. It seems that this exception is based upon the principle that a breach of the confidential relationship is, in itself, a constructive fraud. (Vol. 3, Bogert on Trusts, § 498.) In several Missouri cases the court has stated that, generally speaking, the mere subsequent breach of an oral agreement to reconvey real estate is not in itself sufficient to raise a constructive trust. Beach v. Beach, Mo., 207 S.W.2d 481; Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981; Norton y. Norton, Mo., 43 S.W.2d 1024. On the other hand, the courts have stated in other cases that the breach of such an oral agreement in itself constitutes constructive fraud for which equity will give relief if the property was actually conveyed or devised in reliance upon such agreement. Strype v. Lewis, 352 Mo. 1004, 180 S.W.2d 688, loc. cit. 691, 155 A.L.R. 99; Vol. 3, Scott on Trusts, § 491, pp. 2379–2380. And it has been stated, on eminent authority, that in such cases "constructive fraud" is sometimes held to be merely an expression of the idea that a constructive trust may arise in the absence of fraud. (Vol. 3, Scott on Trusts, § 462.) Much necessarily depends on the actual circumstances of each case, regardless of the general language used. We think it is safe to say that all the authorities recognize that constructive fraud is sufficient, but that there is considerable contrariety of opinion as to just what constitutes constructive fraud, and each case must stand on its own feet, if fraud be necessary. A constructive trust is held to be within the provisions of Section 456.030 RSMo 1949, V.A.M.S., exempting implied trusts from the effect of the Statute of Frauds. Bryan v. McCaskill, 284 Mo. 583, 225 S.W. 682; Strype v. Lewis, 352 Mo. 1004, 180 S.W.2d 688, 155 A.L.R. 99.

But, supplementary to the above general principles, a rule has become firmly implanted in the Missouri law, with reference to public or involuntary sales. It is that where the equitable owner or one having an interest in land is induced to refrain from protecting his interest at such sale by reliance upon the oral promise of another to buy in the land and to reconvey it to such beneficial owner upon being reimbursed, such a purchaser will be charged as a constructive trustee if he subsequently fails or refuses to carry out his promise. See: Bryan v. McCaskill, 284 Mo. 583, 225 S.W. 682; Scholle v. Laumann, Mo.App., 139 S.W.2d 1067; Slowey v. McMurray, 27 Mo. 113; Leahey v. Witte, 123 Mo. 207, 27 S.W. 402; Richardson v. Champion, 143 Mo. 538, 45 S.W. 280; Phillips v. Jackson, 240 Mo. 310, 144 S.W. 112; Laughlin v. Laughlin, 291 Mo. 472, 237 S.W. 1024; State ex rel. Cruzen v. Ellison, 278 Mo. 199, 211 S.W. 880; Wright v. Cobb, Mo., 229 S.W. 171; Rose v. Bates, 12 Mo. 30. And see also: Vol. 3, Scott on Trusts, § 484, p. 2363; Vol. 1, Scott on Trusts, § 44.4, p. 257. In the section last cited from Scott, the author states: "In order to entitle the owner to relief, however, it is held by the weight of authority that it is not essential to show that the purchaser never intended to carry out his promise, or was otherwise guilty of fraud, or to show that there was a fiduciary or confidential relation between the purchaser and himself. Although the mere oral promise by a grantee is generally held not a sufficient ground for imposing a constructive trust where the owner of land voluntarily conveys it to the grantee, and in such a situation a constructive trust will not be imposed unless the grantee was guilty of fraud or of an abuse of a fiduciary or confidential relation, yet in the case of an involuntary sale by the weight of authority such a promise is sufficient, if it induced the owner not to take any steps to prevent the sale or otherwise protect his interest." The cases cited above show that Missouri is included in the "weight of authority" referred to. These cases proceed on the theory that such circumstances operate as constructive fraud or as an unjust enrichment, or both, and that a showing of an actual fraudulent intent is wholly unnecessary. In certain cases the principle has been fully recognized but the evidence held insufficient. Thus, see: Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447, where the court apparently questioned the motives of

the plaintiffs, the good faith of the supposed agreement, and any actual suppression of bidding.

Appellants rely in part upon the case of Gates Hotel Co. v. C R H Davis Real Estate Co., 331 Mo. 94, 52 S.W.2d 1011. A sale under deed of trust was involved there and plaintiff (the equity owner) claimed an oral agreement by the holder of an encumbrance to bid in the property and permit it to redeem. Apparently there was no evidence that plaintiff was thus actually induced not to bid, or not to protect the property by having others bid, or that the arrangement in any way chilled or suppressed bidding. While the court said that fraudulent conduct must be alleged and proved, we think that it did not thus mean to exclude a finding of constructive fraud from circumstances showing that the oral promise actually induced the beneficial owner and others interested to refrain from protecting and bidding upon the property, and that bidding was thus actually "chilled" and suppressed, to the distinct financial advantage of the defendant. The court there considered the line of cases last cited above and did not overrule them; indeed it quoted with approval from the case of Slowey v. McMurray, 27 Mo. 113, one of the leading cases on the point. If the true meaning of the Gates case, supra, is otherwise, it is not controlling here for we think, as later developed, that there was, on this evidence, a confidential relationship existing between Ida Swon—representing her grandchildren, —and Wilmer Huddleston. In the case of Young v. Kansas City Life Ins. Co., 329 Mo. 130, 43 S.W.2d 1046, (also cited) the evidence apparently did not actually show that any prejudice had resulted to the promisee or that she could in any event have protected the property at the sale; nor had plaintiff at any time offered to reimburse the defendant. It further appeared there that the alleged agreement was also somewhat ambiguous. We think the case is distinguishable.

We defer to the ultimate finding of the trial court in considering the credibility of the witnesses. Van Eaton v. Dennis, Mo., 242 S.W.2d 21; Starr v. Mitchell, Mo., 237 S.W.2d 123; Section 510.310 RSMo 1949, V.A.M.S. So doing, we hold that the agreement in question was established by sufficiently clear, cogent and satisfying evidence, as were also: the reliance of Ida Swon (representing plaintiffs) and her relatives and friends thereon; the suppression of bidding; an actual refraining from other available methods of protecting the property; and the fact that the agreement and conduct of Huddleston induced the other prospective bidders to permit him to bid in the property at a very advantageous price. We think the price was low, but do not rely on that as controlling; however, by his purchase Huddleston procured the possession and use of the land for a long period of years, and the defendants have nowhere denied that he had fully reimbursed himself for his outlay and expense. Indeed, considering also the sale of three tracts, it is almost inconceivable that he did not profit substantially. In considering the evidence, we note the negative testimony of the defendants that they heard no such agreement made or acknowledged by their father at the time of the sale or later. We do not feel that this is sufficient to raise a substantial doubt, in view of the other evidence. Even if such were true, it is extremely doubtful if that testimony was admissible in view of the "Dead Man's" statute, Section 491.010 RSMo 1949, V.A.M.S.; the defendants' interest was derivative from a party to the transaction and the acting agent of the plaintiffs, Ida Swon, was dead at the time of trial. See: Wagner v. Binder, Mo., 187 S.W. 1128; McCutchan v. Kansas City Life, MoApp., 122 S.W.2d 59; Bone v. Friday, 180 Mo. App. 577, 167 S.W. 599; Wilden v. McAllister, 91 Mo.App. 446. The disqualification of the statute seems to extend to everything which the deceased agent might question, if living. Sturdy v. Smith, Mo. App., 132 S.W.2d 1033; Allaben v. Shelbourne, 357 Mo. 1205, 212 S.W.2d 719. We think that the subsequent conversations in which Huddleston recognized the trust are important. Padgett v. Osborne, 359 Mo. 209, 221 S.W.2d 210.

We hold also that Huddleston was in a confidential relationship with Ida Swon, and, through her, with the Swon "heirs" involved here; he was her brother and he had until four and one-half months before the sale been the official trustee under the will for these heirs; technically, he was then discharged, but apparently he had never recorded a deed to the heirs, and in the partition proceeding he was made a party defendant, *as trustee*. There is also evidence that until 1946 he continued, unofficially, to receive certain funds for the children from Ella Wallace. The family respected and looked up to him. All this, we think, was sufficient to establish a confidential and fiduciary relationship. Trieseler v. Helmbacher, 350 Mo. 807, 168 S.W. 2d 1030; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842; Munday v. Knox, 321 Mo. 168, 9 S.W.2d 960; Selle v. Wrigley, 233 Mo.App. 43, 116 S.W.2d 217; 15 C.J.S. Confidential, pp. 821, 823, which means confidence reposed, and influence arising from that confidence.

So holding, a constructive trust arose, but only for the benefit of those included within the terms of the agreement who then (on December 4, 1939) actually had an interest in the land or were equitable owners. Bryan v. McCaskill, 284 Mo. 583, 225 S.W. 682, loc. cit. 687; Phillips v. Jackson, 240 Mo. 310, 144 S.W. 112; Richardson v. Champion, 143 Mo. 538, 45 S.W. 280, loc. cit. 281; Janssen v. Christian, Mo. App., 57 S.W.2d 692; Vol. 3, Scott on Trusts, § 484; Vol. 1, Scott on Trusts, § 44.4. The title was adjudicated in the very proceedings out of which this sale emanated. No appeal was taken and the decree was and is final. It was there decreed that John H. Swon *had no interest;* that J. C. Smith and Frank Baker owned an undivided one-half interest and that the four plaintiffs herein other than John H. Swon owned the other undivided one-half interest. The oral agreement and purchase of Wilmer Huddleston did not purport, under any construction, to be made for the benefit of J. C. Smith or Frank Baker nor is there any evidence that it induced any action or lack of action on their part;

indeed, one of them bid at the sale, dropped out of the bidding, and immediately afterwards appeared to be entirely satisfied; they have made no further claim. And we note also that they filed the partition suit, caused the sale, and were really acting in opposition to the interests of the Swon heirs. We hold that no trust arose for their benefit. As stated, none could arise for John H. Swon because he then had no remaining interest in the land; indeed, his complete loss of interest was conceded at the trial. The oral agreement of Huddleston to buy for the heirs cannot be effective in and of itself, for the benefit of John H. Swon or otherwise, as previously discussed. We think that Huddleston's agreement was sufficient to include those "heirs" who still had an interest; but the constructive trust may only be invoked to the extent of their interest, an undivided one-half. As this result differs from what appellants say was the trial theory of plaintiffs, we refer them to: Collins v. Shive, Mo., 261 S.W.2d 58, loc. cit. 60, and Decker v. Fittge, Mo., 276 S.W.2d 144, loc. cit. 149, for the rule on consideration of equity appeals.

We may deal briefly with the defenses of laches and limitations, both properly pleaded. We hold that there is no bar by laches for the very simple reason that mere delay does not, in itself, raise the bar, and some prejudice to the defendant must be shown. Davies v. Keiser, 297 Mo. 1, 246 S.W. 897; Collins v. Shive, Mo., 261 S.W.2d 58; Hagan v. Lantry, 338 Mo. 161, 89 S.W.2d 522; Stephenson v. Stephenson, 351 Mo. 8, 171 S.W.2d 565. There has been no prejudice to Huddleston or to his sons, but rather the contrary. We also consider the confidential relationship, the misleading effect of the subsequent affirmances of the agreement and the ages of the plaintiffs.

The ten-year statute of limitations, Section 516.010, RSMo 1949, V.A.M. S., is urged as a bar. It has often been stated that the statutes of limitations do not begin to run against an express trust until there is a repudiation, with notice, but it is also sometimes stated, without close analy-

sis, that the statute does run against a resulting or constructive trust. Warwick v. DeMayo, 358 Mo. 130, 213 S.W.2d 392; Kerber v. Rowe, 348 Mo. 1125, 156 S.W.2d 925; Hudson v. Cahoon, 193 Mo. 547, 91 S.W. 72; Zeitinger v. Annuity Realty Co., 325 Mo. 194, 28 S.W.2d 1030. But when those cases are closely considered, it appears that the beneficiary actually had notice of a breach of faith on the part of the trustee at or before the time the statute was held to begin to run. Where the trust, though not an enforceable express trust because not in writing, arises from consent of the parties and under the circumstances here present, and is not an involuntary trust, we do not think the statute of limitations begins to run until the trust is repudiated by some word or act sufficient to give reasonable notice to the beneficiary. Laughlin v. Laughlin, 291 Mo. 472, 237 S. W. 1024; Feis v. Rector, Mo., 239 S.W. 515; Cunningham v. Kinnerk, 230 Mo.App. 749, 74 S.W.2d 1107; Vol. 3, Scott on Trusts, § 481.1. And especially is this true where a confidential relationship exists, Foster v. Petree, 347 Mo. 992, 149 S.W.2d 851, or where there is a continuing recognition of the trust. The case of Kerber v. Rowe, 348 Mo. 1125, 156 S.W.2d 925, supra, sometimes cited to the contrary, seems to recognize the distinction which exists where (and so long as) the existence of the trust is acknowledged. We hold that this claim is not barred by the statute of limitations, for certainly no repudiation prior to 1951 was shown.

The persons who purchased three tracts of this land in 1945 and 1946 are not parties to this suit. We do not, and may not, try their titles here. We note, however, that it has been indicated that the declaration of a constructive trust does not impose such trust upon property in the hands of prior bona fide purchasers for value without notice. Vol. 3, Scott on Trusts, § 474; Collins v. Shive, Mo., 261 S.W.2d

58. This opinion does not purport to affect the rights of any purchasers who are not parties herein. The widow of Wilmer Huddleston was still alive at the time of trial, but she was not made a party. We do not think this material, for any marital interest which she may have would only attach to the undivided one-half interest remaining in the defendants.

Plaintiffs have not prayed for an accounting and there is no evidence on that subject; nor have defendants made any contention that Wilmer C. Huddleston had not been fully reimbursed for his outlay at the sale, interest, and expense incurred. Under these circumstances we pass those matters and assume, and so hold, that Wilmer C. Huddleston was in fact fully reimbursed. If there was any claim to the contrary, it should have been raised in this case, in the alternative or otherwise. Under the circumstances it seems needless for us to declare the sheriff's deed to be in fact a deed of trust which has now been satisfied. Although such is true in theory, we merely declare the effect of the trust, and direct that the title be adjudicated accordingly as between the parties.

It follows from the foregoing that the judgment and decree herein should be reversed and the cause remanded to the circuit court with directions to set same aside and to enter a judgment and decree which, as between the parties to this cause, vests an undivided one-half interest in the lands involved herein in plaintiffs Ethel M. Anderson, Ella Englehart, Kathryn Adcock and Wallace E. Bell as tenants in common, and which divests defendants, and each of them, of title and interest accordingly, but only to that extent; such judgment and decree shall further find and decree that plaintiff John H. Swon has no interest in the lands in question.

It is so ordered.

All concur.